**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 08-20373-CIV-SEITZ/O'SULLIVAN

SAREGAMA INDIA LTD.,

      Plaintiff,

v.

TIMOTHY MOSLEY, et al.,

      Defendants.

_____/

### ORDER: (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND (3) GRANTING IN PART PLAINTIFF'S MOTION FOR VOLUNTARY DISMISSAL

THIS dispute arises from Defendants' sample of an Indian sound recording known as Bagor Mein Bahar Hai ("BMBH") in the song "Put You on the Game" ("PYOG") which appeared on Jayceon Taylor's 2005 album "The Documentary." At the November 10, 2009 hearing on the parties' motions for summary judgment [DE 174, 176, 179, 181], Plaintiff ("Saregama") argued that it held a valid copyright in the BMBH sound recording pursuant to a 1967 agreement between the author Shakti and its predecessor in interest, Gramophone. Saregama also argued that it was entitled to summary judgment because Defendants admit that they sampled the BMBH sound recording. Defendants maintained that Saregama's 1967 agreement conveys no more than a license to exploit subject works and that there is no evidence that the BMBH sound recording was subject to the 1967 agreement. Defendants also argued that, irrespective of whether they sampled the BMBH sound recording, the BMBH sound recording and PYOG are not substantially similar.

After considering the arguments of counsel, the motions, the responses and replies thereto, the relevant legal authorities, and the record, the Court will grant Defendants' motion and deny Saregama's motion because the 1967 agreement confers, at most, an exclusive license for two years and a non-exclusive license thereafter, and Saregama proffers no proof that the BMBH sound recording was created during the term of the agreement or that it obtained the copyright through other means. Further, aside from the approximately one-second snippet sampled from the BMBH sound recording, the two works bear no similarities and no jury, properly

-1-

instructed, could find that the songs are substantially similar.

## I.    Factual Background

### A. Rights in the BMBH Sound Recording: The 1967 Agreement

#### 1. The Assignment

On April 24, 1967, Shakti Films ("Shakti") and Gramophone Company of India, Ltd. ("Gramophone"),

a predecessor in interest of Saregama, came to an agreement regarding the production and distribution of music

soundtracks to Shakti's movies.  (*See* DE 187, Ex. 3 "Agreement.")  The Agreement provides two methods by

which Shakti agreed to provide music to Gramophone.  (*See id.* ¶¶ 2, 4.)  First, Shakti may provide

Gramophone with musicians who record songs at Gramophone's behest:

> [Shakti] . . . shall supply [Gramophone] at their own expense with artistes and musicians etc.,
> to perform musical and/or other works from their films for the purpose of making gramophone
> records, and the artistes and musicians etc., shall attend at [Gramohpone's] studio or such other
> place . . . and shall at such place and time record such works as [Gramophone] shall select . . . .

(*See id.* ¶ 2.)

As an alternative to providing musicians, Shakti agreed to provide Gramophone with pre-recorded

songs, known conventionally as sound recordings, to be re-recorded:[1]

> Notwithstanding the provisions in *clauses 2* and *3* hereof[,] [Shakti] shall at their own expense
> alternatively and subject to the consent of [Gramophone] supply [Gramophone] with sound
> tracks or recorded tapes of their musical and/or other works and [Gramophone] shall utilise
> such sound tracks or recorded tapes for the purpose of re-recording therefrom and the
> subsequent manufacture of gramophone records as referred to in the above-mentioned clauses
> provided they are in the opinion of [Gramophone] suitable for such purpose.

(*See id.* ¶ 4) (emphasis in original).

Whether by musician or pre-recorded song, the music Gramophone obtained from Shakti carried with it

-----

[1] Unlike musicians who performed at Gramophone's pleasure, Gramophone lacked creative control over
and authorship of pre-recorded songs.  Therefore, to protect Gramophone against any subsequent actions by a rogue
producer or other third party claiming rights in the pre-recorded songs, Shakti agreed to indemnify Gramophone:

> [Shakti] agree[s] to indemnify [Gramophone] and keep [Gramophone] indemnified from and
> against all actions, claims and damages in which [Gramophone] may be incurred by reason of such
> re-recording and subsequent manufacture, issue and sale of gramophone records derived from
> sound tracks or recorded tapes supplied by [Shakti] as aforesaid.

(*See* Agreement ¶ 4.)

Shakti's rights to record and re-record the works: "[Shakti] hereby agree[s] that they assign their gramophone recording rights in all works to be recorded or re-recorded under the provisions of this Agreement to [Gramophone] . . . ." (*See id.* ¶ 7.)  Further, the Agreement provides that Gramophone shall own the "original plate" of all works "within the meaning of The [Indian] Copyright act of 1957."[2]  (*See id.* ¶ 10.)  By its terms, the Agreement took effect on January 15, 1967 and terminated on January 15, 1969.[3]  (*See id.* ¶ 2.)  During this two-year term, Shakti was prohibited from providing *any* musicians or pre-existing recordings to other production companies.  (*See id.* ¶ 5.)  Finally, the Agreement provided that its terms were governed by Indian law.  (*See id.* ¶ 15.)

### 2. Royalties

In exchange for the right of recording, re-recording, and selling these records, Gramophone agreed to pay Shakti royalties.  The royalty payments are arranged according to the origin of the work (whether the work is created by Shakti musicians or reproduced from Shakti recordings) and whether the final soundtrack commingles Shakti-owned songs with songs owned by others.

For soundtracks produced from works recorded by Shakti's musicians, the Agreement provides royalties at the following rates:

(a) In the case of a double-sided disc record:

> (i) Performance by [Shakti's] artistes of any work or works owned by [Shakti] on any one side of a record: 2.5% per side

> (ii) Performance by [Shakti's] artistes of any work or works owned by [Shakti] along with performance by other artistes of a work or works not owned by [Shakti], on any one side of a record a share proportional to the number of

---

[2]  The Indian Copyright Act of 1957 defines a "plate" as:

> [A]ny stereotype or other plate, stone, block, mould, matrix, transfer, negative, [duplicating equipment] or other device used or intended to be used for printing or reproducing copies of any work, and any matrix or other appliance by which sound recording for the acoustic presentation of the work are or are intended to be made.

Indian Copyright Act ("ICA") Chapter 1, Section 2(t).

[3]  The Agreement allows Gramophone to extend the term to January 15, 1970 upon written notice to Shakti, before the expiration of the original term.  (*See id.* ¶ 12.)

works []: 2.5 % per side

(b) In the case of any other record, the same shall be deemed to consist of Sections, each Section comprising the equivalent of a double-sided 78 rpm record and royalty shall be calculated on the same basis as provided under (a) (i) and (ii) above on each such Section reproducing performances of [Shakti's] artistes.

(*See id.* ¶ 6.)

However, if, after the Agreement's two-year term, Shakti allowed another production company to record or re-record any songs obtained by Gramophone under the Agreement, Gramophone is no longer bound to pay Shakti a royalty for works recorded by Shakti's musicians.  (*See id.* ¶ 6.)

By contrast, soundtracks produced from Shakti's pre-recorded songs are governed by similar royalty rates, albeit in a different section of the Agreement:

(a) In the case of a double-sided disc record:

(i) A work or works owned by [Shakti] and reproduced on any one side of a record: 2.5 percent per side

(ii) A work or works owned by [Shakti] and reproduced along with one or more other works not owned by [Shakti] on any one side of a record, a share proportional to the number of works []: 2.5 percent per side

(b) In the case of any other record, the same shall be deemed to consist of Sections, each Section comprising the equivalent of a double-sided 78 rpm record and royalty shall be calculated on the same basis as provided under (a) (i) and (ii) above on each such Section reproducing the works owned by [Shakti].

(*See id.* ¶ 8.)

When royalties "shall become payable to [Shakti]" for soundtracks produced both from Shakti's artists and pre-recorded songs, Gramophone is entitled to confer manufacturing and sales rights to other parties. (*See id.* ¶ 10.)

### B. Saregama's Evidence Demonstrating Ownership of BMBH

The production dates for the BMBH sound recording and the Bollywood film Aradhana in which it played are unclear.  On August 7, 1968, Shakti sent a letter to Gramophone regarding royalty payments for Aradhana, which reads:

We hereby irrevocably authorise you to pay 2.1/2% (two and half percent) per record, out of

-4-

> our share of royalty payable by you to us on the sale of the gramophone records of our above film, direct to Shri S. D. Burman, Music Director of the film "AARADHANA" (Production No. 8.)."

(*See* DE 187, Ex. 1 "Letter 1".)

Similarly, on May 2, 1968, Shakti directed Gramophone to pay royalties to a singer:

> We hereby irrevocably authorise you to pay royalty amount . . . directly to Miss LATA MANGESHKAR on all the songs sung by her for [Aradhana] out of the royalties becoming payable by you to us on sale of Gramophone Records of the said film . . . .

(*See* DE 187, Ex. 8 "Letter 2".)

According to Saregama's corporate representative's declaration, BMBH was recorded in 1968. (*See* DE 183 "Ramji Decl." ¶ 7.) However, at his deposition, Ramji conceded that he did not know when BMBH was recorded. (*See* DE 178, Ex. 1 "Ramji Depo." at 84-85.) Indeed, he speculated that it could have been produced in 1969 or 1968. (*See id.*)

According to Ashim Samanta, a principal at Shakti, the film Aradhana was released in October or November of 1969. (*See* DE 195, Ex. 1 "Samanta Depo." at 70-72.) However, Samanta admits that he has no personal knowledge as to when the film was produced. (*See id.*) Further, although Samanta speculates that Aradhana's soundtrack was released three to six months prior to the movie, he concedes that he does not know when the soundtrack featuring BMBH was released. (*See id.* at 17-18.)

Samanta wrote a May 2009 letter on behalf of Shakti which states that Saregama owns the copyrights in BMBH pursuant to the 1967 Agreement. (*See* DE 187, Ex. 1 "Samanta Letter.") However, in his deposition, Samanta admits that: (1) he knows nothing about copyright law and cannot distinguish an assignment from a license; (2) although he signed the letter, it was drafted by Adel Churamani, a Saregama representative; and (3) he hadn't read the Agreement until he signed the May 2009 letter. (*See* Samanta Depo. at 74-78, 81.) Samanta states that, upon review of the letter and the Agreement, he believes that Saregama owns the copyright. (*See id.*)

As further evidence of ownership, Saregama proffers a xerox copy of a vinyl record label indicating that it contains the BMBH sound recording. (*See* DE 187, Ex. 9 "Record Label".) The label names both

-5-

Gramophone and Shakti, and along its rim it reads: "all rights of the manufacturer and of the owner of the recorded work reserved." (*See id.*) Saregama also submits letters and charts reflecting sales of BMBH and royalties paid to Shakti. (*See* DE 187, Ex. 11, 12, 13, 17.) According to the letters and charts, the earliest royalties were paid in November 2005. (*See* DE 187, Ex. 13.)

Finally, Saregama provides a document which is labeled an "extract from the register of copyrights" from the "government of India." (*See* DE 187, Ex. 4 "Extract".) The extract indicates that "Gramco"[4] is the applicant, and that the work's title is "Aradhana." (*See id.*) Shakti is listed as the work's author and that the work was published in 1969. (*See id.*) Next to the title an identification number is listed: "SPH0830115." (*See id.*) According to Saregama's corporate representative, the SPH0830115 number represents the identification number in its catalog. (*See* Ramji Depo. at 43, 101.) However, in another deposition, Saregama's corporate representative reveals that the only catalog number for the complete Aradhana soundtrack is "130327." (*See* DE 178, Ex. 9 "Ramji Depo. 2" at 3.)

C. Defendants' Involvement in Producing the Song "Put You On the Game"

Defendant Timothy Mosley produced "Put You On the Game" ("PYOG") for Jaceyon Taylor's album "The Documentary," released in 2005. (*See* DE 182 "Pl. SoF" ¶¶ 20, 24.) Mosley included an approximately one-second snippet of BMBH in PYOG. (*See id.* ¶ 21.) According to Defendant G-Unit Records, it had no involvement in or control over the creation, distribution, or sale of PYOG. (*See* DE 180 "G-Unit Decl." ¶ 3.) Rather, G-Unit asserts that its only connection to PYOG is that it "receives a passive income participation" pursuant to an agreement with Interscope and Aftermath records. (*See id.* ¶ 4.) However, according to Saregama, the Documentary album sleeve contains the G-Unit logo and indicates that G-Unit owns the copyrights in the album. (*See* DE 207 ¶ 1.) Further, Saregama remarks that G-Unit's sole principal Curtis Jackson is credited as the album's executive producer. (*See id.*)

According to Defendant Desperado Entertainment, it had no involvement in or control over the creation, distribution, or sale of PYOG. (*See* DE 175 "Harris Decl." ¶¶ 3, 4.) However, Saregama claims that

---

[4] According to Ramji, Gramco held all of Gramophone's copyrights until the two firms merged in 2000. (*See* Ramji Decl. ¶¶ 12-14.) That same year, Gramophone changed its name to Saregama. (*See id.* ¶ 15.)

Desperado, doing business as "Each1Teach1," holds itself out as publisher of PYOG. (*See* DE 199 ¶ 1.) Saregama also asserts that, in its responses to interrogatories, Desperado indicates that it provided services to Jaceyon Taylor and it took part in the licensing or distribution of PYOG. (*See id.*)

D. Expert Testimony: Analyzing BMBH and PYOG

The snippet appearing in both BMBH and PYOG consists of three notes: D, B flat, and G. (*See* DE 178, Ex. 4 "Ricigliano Report" ¶ 11.) Together, the notes form a descending chord known as a G minor arpeggio. (*See id.*) In BMBH, this G minor chord is looped four times to create a "vocal unit," which appears at 0:21, 0:38, and 1:49, 2:52. (*See id.* ¶ 12; DE 178, Ex. 6 "Oxendale Report" at 2.) The total vocal unit in BMBH is approximately 2 seconds in length. (*See* Ricigliano Report ¶ 12.) In PYOG, the G minor chord is first looped three times, and after an intervening D note, is looped twice more. (*See id.* ¶ 14; Oxendale Report at 4.) Thus, the looped G minor chord in PYOG produces a slightly modified version of the vocal unit in BMBH. (*See* Ricigliano Report ¶ 17.) The vocal unit in PYOG appears at 1:08, 2:03, and 3:47. (*See id.* ¶ 15.)

According to Saregama's expert Mr. Oxendale, the vocal unit at issue in BMBH is a distinctive and memorable piece of the song as a whole. (*See* Oxendale Report at 2.) Oxendale also opined that the vocal unit in PYOG is a distinctive portion of the song as a whole. (*See id.*) Oxendale concluded that the vocal unit at issue in PYOG was copied from BMBH's vocal unit and subject to a slight degree of manipulation. (*See id.*) By contrast, Defendants' expert Mr. Ricigliano asserted that the vocal unit at issue in BMBH was not original and a basic musical element. (*See* DE 195, Ex. 2 "Ricigliano Depo." at 5.) Further, Ricigliano opined that, although PYOG may have copied from BMBH, BMBH and PYOG are dissimilar compositions as a whole. (*See id.* at 6; Ricigliano Report ¶ 26.)

At his deposition, however, Mr. Oxendale admitted that he did not compare BMBH's vocal unit to other portions of BMBH to determine its relative importance. (*See* DE 178, Ex. 5 "Oxendale Depo." at 14.) Further, Oxendale conceded that the scope of his analysis did not consist of comparing BMBH to PYOG as a whole, but was limited to analyzing the vocal unit at issue in each work to determine whether PYOG sampled BMBH. (*See id.* at 8, 11, 16.)

II.     Procedural History

-7-

On August 27, 2007, Saregama filed its initial complaint in the Southern District of New York, alleging federal and state copyright infringement claims, and seeking damages and injunctive relief. (*See* DE 30 at 5.) On Defendants' motion to transfer venue, the case was transferred to this Court. (*See id.* at 1-2.) Once in this district, the Court granted Defendants' motion to dismiss with leave for Saregama to re-plead. (*See* DE 60.) The Court also entered the Scheduling Order which bifurcated fact and damage discovery, and set trial in April 2010. (*See* DE 62.)

After Saregama filed its Amended Complaint, Defendants Mosley, G-Unit, and Desperado filed a second motion to dismiss, which the remaining Defendants joined despite the fact that they had previously answered the Amended Complaint. (*See* DE 86, DE 110, DE 114.) The Court granted Defendants' motion in part, leaving Saregama with Federal copyright infringement claims for the BMBH musical composition and sound recording. (*See* DE 137.) Thereafter, Saregama voluntarily dismissed its musical composition claims against Mosley, G-Unit, and Desperado. (*See* DE 138.)

Because the remaining Defendants ("WB-Universal Defendants") had answered, Saregama sought a stipulation to dismiss its musical composition claim with each party to bear its own fees in costs in connection with the musical composition claim. (*See* DE 148 ¶ 5.) The WB-Universal Defendants refused to stipulate, therefore Saregama moved to dismiss its musical composition claim on the condition that each party bear its own fees and costs. (*See id.* ¶¶ 6-7.) In response, the WB-Universal Defendants argued that they are entitled to seek fees as the prevailing party under the Copyright Act because Saregama's musical composition claim is without merit. (*See* DE 161 at 6-9.) Saregama replied that it did not seek to dismiss its musical composition claim because it lacked merit, but because it would not provide any relief not available by way of the sound recording claim. (*See* DE 167 at 1-2.) Further, Saregama asserted that the Court has discretion to dismiss the musical composition claim on the condition that each party bear its own fees and costs, and, in any case, an entitlement to fees under the Copyright Act requires more than merely prevailing on the merits. (*See id.* at 3-5.)

On September 11, 2009, both Saregama and Defendants moved for summary judgment. Saregama moved for summary judgment on the grounds that: (1) it held a valid assignment of the BMBH sound recording

copyright from Shakti; and (2) because Defendants admit that they copied a snippet of the BMBH sound

recording, they are liable as a matter of law.  By contrast, Defendants moved for summary judgment arguing

that: (1) the 1967 Agreement only confers on Saregama a license to exploit the BMBH sound recording; (2)

Saregama's other evidence does not establish an assignment of copyright in the sound recording; and (3) the

copying at issue is *de minimis*.  Defendants G-Unit and Desperado also moved for summary judgment on the

grounds that Saregama failed to plead vicarious infringement, and, because they did not participate in the

production of PYOG, they cannot be held liable for direct infringement.  In response, Saregama argued that G-

Unit and Desperado can be held liable for vicarious infringement because they had an ability to control

production of PYOG.[5]

## III.    Standards

### A. Summary Judgment

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d

982, 991 (11th Cir. 2001).  Once the moving party demonstrates the absence of a genuine issue of material fact,

the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)).

The Court must view the record and all factual inferences therefrom in the light most favorable to the

non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods,

Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52).

### B. Copyright

Saregama bears the burden of proving ownership of the BMBH sound recording copyright.  *Feist

Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991).  To make out a prima facie case

---

[5]  Because the Court will grant Defendants' motion on ownership and substantial similarity grounds, it need
not address the arguments made in Defendants G-Unit and Desperado's individual motions.

of copyright infringement, Saregama must show that: (1) it owns a valid copyright in the BMBH sound recording; and (2) Defendants copied protected elements of the BMBH sound recording. *Peter Letterese and Associates, Inc. v. World Institute of Scientology Enterprises, Int'l.*, 533 F.3d 1287, 1300-01 (11th Cir. 2008) (citations omitted).  In the Eleventh Circuit, to prove that Defendants copied its copyrighted work, Saregama must prove both factual *and* legal copying.  *Peter Letterese*, 533 F.3d at 1300-01.  To prove factual copying, Saregama must show that "the defendant, as a factual matter, copied portions of the plaintiff's work." *Id.*  To prove legal copying, Saregama must show that "those elements of the copyrighted work that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *Id.* Thus, legal copying asks "whether there is substantial similarity between the allegedly offending works and the protectable, original elements" of the sound recording.  *Id.*

IV.    **Discussion**

      A. Ownership

            1. The Nature of Rights Assigned by the 1967 Agreement

      Saregama argues that Clauses 7 and 10 of the Agreement demonstrate that Shakti conveyed copyrights in all subject works to Gramophone, its predecessor in interest.  However, a careful reading of both clauses, in conjunction with the Agreement's other clauses, reveals that Shakti at most transferred a two-year exclusive license to Gramophone, and a non-exclusive license thereafter, to exploit Shakti's pre-recorded works.  In Clause 7, Shakti purports to assign Saregama its "gramophone recording rights in all works to be recorded or re-recorded under the provisions of this Agreement . . . ."  (*See* Agreement ¶ 7.)  Saregama interprets this language to convey copyrights in the subject works, but it does not explain why conferral of "gramophone recording rights" is tantamount to an assignment of copyrights.  Furthermore, the very next clause demonstrates that Shakti retained ownership interests in the works at issue: "[i]n consideration of the assignment set out in *Clause 7* hereof[,] [Gramophone] shall pay to [Shakti] a Copyright royalty [on] . . . [a] work or works owned by [Shakti] . . . ."  (*See* Agreement ¶ 8) (emphasis in original).

      What is more, Clauses 5 and 6 confirm that, after January 15, 1969, Shakti was free to confer similar recording rights on parties other than Saregama.  First, Clause 5 prohibits Shakti from conferring recording

rights on Saregama's competitors, but only during the two-year term of the Agreement.  (*See* Agreement ¶ 5.) Saregama argues that Clause 5 only prohibits Shakti from providing musicians to other producers who would create new sound recordings based on Shakti's existing musical compositions.  However, Clause 5's exclusivity expressly applies to works created from Shakti's "artistes and musicians" as well as works created from its "sound tracks or recorded tapes."  (*See id.*)  Thus, Clause 5 prohibits Shakti from providing other producers with its sound recordings, such as those supplied to Saregama, but only for the two-year term contemplated by the Agreement.

Second, Clause 6 provides that if, after January 15, 1969, Shakti provides to other parties the works previously supplied to Saregama, including those recorded by Shakti's "artistes or musicians" or from its "sound track[s] or recorded tape[s]," then Saregama is no longer bound to pay royalties from sales for works recorded by Shakti's artists and musicians. (*See id.* ¶ 6.)  That, following the Agreement's two-year term, Shakti is free to supply the same sound recordings to a third party that it previously gave to Saregama is wholly inconsistent with a transfer of copyright or exclusive license:

> A[n] []owner's ability to grant licenses to third parties unilaterally will therefore depend on the type of licenses granted. There are two general categories of licenses: non-exclusive licenses, which permit licensees to use the copyrighted material and may be granted to multiple licensees; and exclusive licenses, which grant to the licensee the exclusive right-superior even to copyright owners' rights-to use the copyrighted material in a manner as specified by the license agreement.

*Davis v. Blige*, 505 F.3d 90, 99-100 (2d Cir. 2007).

Saregama argues that Clause 6 merely recognizes that Shakti will have breached the contract if it gives to third parties what it previously gave Saregama, thereby relieving Saregama of the burden to pay royalties. However, if Saregama indeed held the copyright or an exclusive license therein, the appropriate action against Shakti's wrongful transfer of rights would not be a breach of contract action, but an action for copyright infringement.  *See id.* at 101 ("An exclusive license . . . conveys an ownership interest . . . .  Accordingly an exclusive licensee may sue others for infringement, *including the licensor if the licensor infringes on the exclusive right he granted the licensee*") (citations omitted) (emphasis supplied).  Furthermore, Clause 6 does not relieve Saregama of the burden to pay royalties in toto, but only those royalties provided under Clause 6.

(*See* Agreement ¶ 6.) Thus, Saregama must continue to pay the royalties dictated by Clause 8, those for Shakti's pre-recorded songs, even after Shakti gives the same pre-recorded song to a third-party producer. (*See id.* ¶¶ 6, 8.) To be sure, the proper reading of Clauses 5 and 6 is that Shakti enjoys the musician royalty from Saregama as long as it does not transfer the subject works to producers other than Saregama, but that Shakti may do so at any time after the Agreement's two-year term. (*See* Agreement ¶¶ 5, 6.)

Clause 10 also supports the position that the Agreement did not transfer copyright in Shakti's pre-recorded works to Saregama. For works performed by Shakti's "artistes and musicians," Clause 10 confers a wide range of rights on Saregama, including exclusive rights of "production, reproduction, sale, use and performance (including broadcasting) throughout the world . . . ." (*See id.* ¶ 10.) Significantly, Clause 10 does not supply Saregama with such rights for Shakti's pre-recorded works, such as the BMBH sound recording. Rather, Clause 10 entitles Saregama to authorize third parties to "manufacture, sell and/or catalogue" all subject works, including both musician-created and pre-recorded works, *only* "when royalties shall become payable to [Shakti] as mentioned in *Clauses 6* and *8* hereof." (*See id.*) (emphasis in original).

Saregama emphasizes that Clause 10 grants it ownership of "the original plate" of all subject works, including pre-recorded works, "within the meaning of The [Indian] Copyright Act of 1957." (*See id.*) However, Saregama does not explain how ownership of "the original plate" equates to ownership of copyrights. To be sure, the Indian Copyright Act defines a "plate" as a "device used or intended to be used for printing or reproducing copies." ICA Chapter 1, Section 2(t). This suggests that the Agreement merely codified that Saregama owned the original means of mass producing the subject works. It does not indicate, as Saregama insists, that Shakti assigned copyrights in the works slated for production, let alone that Shakti could not later provide other producers with a replica "plate" of any subject work for mass production, as Clause 6 contemplates.

Finally, Saregama submits that, if the Agreement's intent is ambiguous, the Court should consider parole evidence of the parties' intent to convey copyrights. Parole evidence is unnecessary, however, because the Agreement clearly does not convey copyrights in Shakti's pre-recorded works. Nevertheless, even if the Court could examine parole evidence, the available evidence is inconclusive. While Ashim Samanta's May

-12-

2009 letter alleges that Saregama owns the copyrights in the BMBH sound recording pursuant to Clause 10 of the Agreement, he conceded at his deposition that: (1) he knows nothing about copyright law and cannot distinguish between an assignment and license; (2) the letter was drafted by a representative of Saregama; and (3) he hadn't read the Agreement until he signed the May 2009 letter. (*See* Samanta Depo. at 70-72, 74-78, 81; Samanta Letter.)

Saregama contends that, because Saregama and Shakti agree that the Agreement validly assigns copyrights, Defendants cannot challenge the terms of the assignment. This argument is without merit. Saregama misquotes *Imperial Residential Design, Inc. v. Palms Development Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995). In that case, the Court held that a third party could not challenge an assignment where *both* the assignor and assignee were joined as plaintiffs and the assignor re-assigned the copyright to the assignee immediately prior to the infringement giving rise to the case in order to cure any defect in a prior assignment.[6] In this case, by contrast, Shakti is not joined as a plaintiff and there is no curative pre-infringement assignment. Furthermore, the Court cannot reasonably rely on Shakti's current understanding of the terms of the Agreement where its representative had not read the Agreement prior to May 2009 and cannot distinguish an assignment from a license. (*See* Samanta Depo. at 74-78, 81.) Thus, the mere fact that Saregama's corporate representative and Ashim Samanta believe that Saregama owns the BMBH sound recording copyright does not preclude inquiry into the terms of the Agreement.

Finally, Saregama's evidence of royalties paid do not prove that Saregama owns copyrights. Indeed, Saregama's royalty payments to Shakti are consistent with a licensing arrangement. Therefore, because the Agreement's terms convey, at most, a two-year exclusive license to exploit Shakti's pre-recorded songs which reverts to a non-exclusive license thereafter, Saregama fails to demonstrate that the Agreement confers copyrights.

### 2. Whether the Agreement Covers the BMBH Sound Recording

Citing to Clause 4, Defendants argue that the Agreement only covers songs that Shakti delivers to

---

[6] *See also Triple Tee Golf, Inc. v. Nike, Inc.*, 2007 WL 4260489 *24 (N.D. Tex. August 10, 2007) (explaining that *Imperial Residential* does not apply to cases in which assignor and assignee are not joined as plaintiffs).

Saregama during the two-year term: "[Shakti] shall . . . supply [Gramophone] with sound tracks or recorded tapes . . . ." (*See* Agreement ¶ 4.)  In response, Saregama argues that the Agreement covers all songs that Shakti created from January 15, 1967 to January 15, 1969.  In either case, however, Saregama does not proffer any evidence which demonstrates that the BMBH sound recording was created during the term of the Agreement.

First, Saregama's corporate representative's declaration and deposition testimony are in conflict.  In his declaration he states that the BMBH sound recording was created in 1968, but in his deposition he speculated that it could have been produced in 1969 and admitted that he did not have personal knowledge as to when the sound recording was produced.  (*See* Ramji Decl. ¶ 7; Ramji Depo. at 84-85.)  Second, Shakti's corporate representative Ashim Samanta admitted that he did not know when the film or the soundtrack was produced.  (*See* Samanta Depo. at 17-18, 70-72.)  Saregama submits Samanta's May 2009 letter as evidence, but the May 2009 letter is not probative because Samanta conceded in his deposition that he did not draft the May 2009 letter and that he has no personal knowledge as to when the BMBH sound recording was created.  (*See id.*)

Saregama also refers to two letters from May 2, 1968 and August 7, 1968 between Shakti and Gramophone which describe a royalty arrangement for records produced from the film, but neither letter demonstrates when the BMBH sound recording was created.  (*See* Letter 1, Letter 2.)  To be sure, there is no evidence to show that the letters were not produced in advance of the film and soundtrack.  Saregama also proffers a xerox copy of a vinyl record label, but the label does not show when the BMBH sound recording was produced.  (*See* Record Label.)  The release date on the record is illegible, and it names both Shakti and Gramophone in an inconclusive fashion, reserving "all rights of the manufacturer *and* of the owner." (*See id.*) (emphasis supplied).

Furthermore, Saregama's extract from the Indian Copyright Office does not establish when the BMBH sound recording was created.  The extract does not indicate that the BMBH sound recording was produced before the Agreement's term expired on January 15, 1969.  Rather, the extract merely indicates that "Aradhana" was published sometime in 1969.  (*See id.*)  Saregama finally argues that the 1967 Agreement provides for a one-year extension option to January 15, 1970, which would remove any doubt that it covered

the BMBH sound recording. (*See* DE 204 at 3-4.) However, there is no evidence that this option was exercised. According to Saregama, it "has continually alleged that the document evidencing the option cannot be located, not that it does not exist." (*See id.*) However, liability discovery has closed and Saregama is obligated to proffer evidence of ownership at this juncture in order to survive summary judgment. Saregama, however, has failed to provide evidence demonstrating that the BMBH sound recording was created during the term of the Agreement.

### 3. Whether the Extract Qualifies as *Prima Facie* Evidence of Ownership

Saregama asserts that its extract should be given deference because U.S. copyright law provides that certificates of registration constitute *prima facie* evidence of ownership. *See In Design v. Lauren Knitwear Corp.*, 782 F.Supp. 824, 829 (S.D.N.Y. 1991). However, even assuming that the extract warranted deference from this Court, it is unclear what work the extract protects because the catalog number on the extract conflicts with the catalog number for the Aradhana film soundtrack on which the BMBH sound recording appears. Saregama's corporate representative testified that the catalog number on the extract ("SPH0830115") matched Saregama's internal catalog. (*See* Ramji Depo. at 43, 101.) However, Saregama's corporate representative later testified that the only catalog number for the complete Aradhana film soundtrack on which BMBH appears is "130327." (*See* Ramji Depo. 2 at 3.) Due to such inconsistency, the Court cannot give deference to the extract Saregama proffers.

In sum, there is no evidence to support that the BMBH sound recording was created during the term of the Agreement, nor is there evidence that the Agreement was extended for another year. Also, Saregama has not shown that the Agreement creates more than a licensing arrangement. Finally, neither Saregama's extract nor any other record evidence shows that Saregama has a copyright interest in the BMBH sound recording. Without any evidence to demonstrate ownership of the BMBH sound recording, the Court must deny Saregama's motion and grant Defendants' motion on this issue.

### B. Whether Defendants' Copying is Legally Actionable

#### 1. Originality

Defendants do not dispute that PYOG contains a sample of the BMBH sound recording. Rather, they

maintain that the sampled snippet is an unoriginal and common vocal exercise, and that their expert's testimony as to originality stands unrefuted. However, in arriving at his conclusion that PYOG sampled BMBH, Saregama's expert Mr. Oxendale opined that the female vocal performance in BMBH was "distinctive and memorable." (*See* Oxendale Report at 2.)

Furthermore, Defendants misapprehend Saregama's burden to establish originality. To demonstrate originality, Saregama need only show that the female vocal expression in BMBH was original, not that the particular chord performed was unique. "For example, the idea of hunting a formidable whale at the lead of an eccentric captain is not protected by copyright law. The *expression* of this idea as it is encapsulated in the novel *Moby-Dick*, however, is protected by copyright." *Peter Letterese*, 533 F.3d at 1302 (citing *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1148-49 (11th Cir. 2007)) (emphasis added). Thus, while the G minor chord performed in BMBH may be a common vocal exercise, a jury could reasonably conclude that the female vocal performance of the G minor chord is a distinct expression capable of copyright protection. Therefore, the Court will deny Defendants' motion as to the originality of the BMBH sound recording.

### 2. Substantial Similarity

Saregama contends that a substantial similarity inquiry is unnecessary where, as here, Defendants concede that PYOG sampled elements of BMBH. Alternatively, Saregama argues that the substantial similarity inquiry is not an element of its *prima facie* infringement claim, but is merely an affirmative defense. Saregama, however, misreads the binding law of this Circuit. A *prima facie* infringement claim requires proof of both factual copying and substantial similarity:

> In the absence of direct proof, factual copying may be inferred from circumstantial evidence, either through establishing that the works are strikingly similar, or through proof of access to the copyrighted work and probative similarity. Because defendants admit that portions of Big League Sales were copied, this appeal centers on the subsequent inquiry of whether such copying is legally actionable; that is, whether there is substantial similarity between the allegedly offending works and the protectable, original elements of the book.

*Peter Letterese*, 533 F.3d at 1300-01.

### (a) Applying the Substantial Similarity Test

As a threshold matter, the Court is obligated to perform a substantial similarity inquiry at the summary

judgment stage:

> Historically, courts have hesitated to make determinations as to infringement or non-infringement on a summary judgment motion because of their reluctance to make subjective determinations regarding the similarity between two works. Nonetheless, where the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or where no reasonable jury, properly instructed, could find that the two works are substantially similar, summary judgment is appropriate.

*Id.* at 1302.

Two works are substantially similar if "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."[7] *Leigh*, 212 F.3d at 1214. Substantial similarity can arise from both literal and nonliteral similarities. *Id.* Sampling cases, like the one at bar, involve literal similarities because they deal with the "verbatim copying or paraphrasing of a copyrighted work." *Palmer v. Braun*, 287 F.3d 1325, 1330 (11th Cir. 2002). Where only a small amount of literal similarity exists, also known as "fragmented literal similarity," a substantial similarity may be found if the "fragmented copy is important to the copyrighted work, and of sufficient quantity . . . ." *Id.*

In a music composition copyright case, the Eleventh Circuit recently affirmed and adopted an order granting summary judgment for the defendant because its song "In Da Club" was not substantially similar to copyrightable aspects of the plaintiff's song "Its Your Birthday." *Lil' Joe Wein Music, Inc. v. Jackson*, 245 Fed. Appx. 873, 875 (11th Cir. 2007). In addition to ruling that the "it's your birthday" phrase in both songs was an unoriginal aspect of the plaintiff's song, the court ruled that the similarity between the songs was *de minimis*:

> Outside of that limited "birthday phrase," there are virtually no similarities between the contested works. Indeed, Lil' Joe Wein does not allege that any aspect of "In Da Club" infringes upon "Its Your Birthday" other than the initial "birthday" section. Once those non-protectible elements are removed, no similarities remain. Moreover, the disputed phrase, although prominently placed at the beginning of "In Da Club," represents only approximately eleven seconds of a three-minute, thirteen-second song . . . It is, therefore, the finding of the Court that Lil' Joe Wein fails the intrinsic test as well because the "average lay observer"

---

[7] In past cases, the Eleventh Circuit used a substantial similarity inquiry which involves "extrinsic" and "intrinsic" tests developed in the Ninth Circuit. *See, e.g., Herzog v. Castle Rock Entm't*, 193 F.3d 1241 (11th Cir. 1999). However, the "extrinsic" and "intrinsic" distinction has been eschewed in favor of a single, distilled inquiry. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1224 n.5 (11th Cir. 2008) ("we believe that the *Herzog* formulation is not useful in this case because the two tests ultimately merge into a single inquiry: whether a reasonable jury could find the competing designs substantially similar at the level of protected expression").

would not confuse the two works. No reasonable jury, properly instructed, could conclude that Lil' Joe Wein's and the Defendants' compositions are substantially similar.

*Id.* at 880.

Similarly, in *Jean v. Bug Music, Inc.*, 2002 WL 287786 *2 (S.D.N.Y. Feb. 27, 2002), the court ruled that two songs were not substantially similar where, "the songs, taken as a whole, [were] substantially different," and "the only identical portions of the two songs are the first three words and notes," which the court found were common musical and lyrical phrases.

In this case, the only portion of BMBH found in PYOG is an approximately one-second snippet of a female vocal performance appearing at 0:21, 0:38, 1:49, and 2:52. (*See* Ricigliano Report ¶ 11; Oxendale Report at 2.) In PYOG, the one-second snippet is looped in the refrain of the song at 1:08, 2:03, 3:08, and 3:47. (*See* Ricigliano Report ¶ 15.) Other than the one-second snippet, the songs bear no similarities. Taken as a whole, PYOG and BMBH are completely different songs, with different lyrical content, tempo, rhythms, and arrangements. Indeed, it is highly unlikely that the average lay observer could discern the source of the one-second snippet without prior warning. Saregama's expert claims that the snippet is unique, however he did not compare the works to determine the snippet's relative importance in each song or whether the songs are similar as a whole. By contrast, Defendants' expert opined that PYOG and BMBH are dissimilar as a whole. (*See* Ricigliano Report ¶ 26.) To be sure, no reasonable jury, properly instructed, would mistake PYOG for BMBH or conclude that the two works were substantially similar.

### (b) Substantial Similarity and Sound Recordings: The *Bridgeport* Case

As an alternative position, Saregama contends that sound recordings like BMBH must be treated differently from other forms of copyrightable work, relying on *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005). There the Sixth Circuit held that *any* sampling of a sound recording constitutes infringement, no matter how small the sampled snippet. *Id.* at 798-05. However, the Sixth Circuit's decision to carve out an exception for sound recordings has not been followed in this Circuit. Indeed, the Eleventh Circuit imposes a "substantial similarity" requirement as a constituent element of *all* infringement claims:

> No matter how the copying is proved, the plaintiff also must establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work with regard to its

protected elements. *Even in the rare case of a plaintiff with direct evidence that a defendant attempted to appropriate his original expression, there is no infringement unless the defendant succeeded to a meaningful degree.*

*Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (citations omitted) (emphasis supplied). Therefore, although factually similar, the *Bridgeport* court's exception for sound recordings presents a departure from Eleventh Circuit precedent.

Saregama also fails to persuade the Court that, in the future, the Eleventh Circuit will depart from the black-letter consensus, which requires proof of substantial similarity, to follow the Sixth Circuit's exception for sound recordings. In *Bridgeport*, the defendant sampled a two-second snippet of the plaintiff's copyrighted guitar solo, lowered and extended its pitch, and looped the snippet at five places throughout the background of the song. *Id.* at 796. The district court held that, although the sampled portion may have been important to the plaintiff's work, it would not be recognized by a lay observer, let alone an observer familiar with the plaintiff's work and was therefore not substantially similar. *Bridgeport Music, Inc. v. Dimension Films*, 230 F.Supp.2d 830, 842 (M.D. Tenn. 2002).

The Sixth Circuit reversed. In essence, the Sixth Circuit held that the copyright statute dictated a broader scope of protection for sound recordings than that afforded to musical compositions or other types of copyrightable work. *Bridgeport*, 410 F.3d at 800-01. Rather than couching this distinction in the "copyright-granting" statutory provisions of 17 U.S.C. § 106,[8] the Sixth Circuit looked to 17 U.S.C. § 114(b),[9] which

---

[8] The *Bridgeport* court first quoted Section 106 and the general limiting provision of Section 114(a):

Our analysis begins and largely ends with the applicable statute. Section 114(a) of Title 17 of the United States Code provides:

The exclusive rights of the owner of copyright in a sound recording are limited to the rights specified by clauses (1), (2), (3) and (6) of section 106, and do not include any right of performance under section 106(4).

Section 106 provides:

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

clarified and limited the scope of copyright protection for sound recordings, to proclaim that "a sound recording [copyright] owner has the exclusive right to 'sample' his own recording." *Id.*

It is not clear to this Court, however, why the *Bridgeport* court's reading of Section 114(b) follows inexorably from its text. First, Section 114(b)'s derivative-work provision addresses the scope of protection given to derivative works, not original works. There is no indication that Congress sought to expand the scope of protection for *original* works by redefining the term "derivative work" to include all works containing *any* sound from the *original* sound recording, whether those works bear substantial similarities to the original work or not. In other words, Section 114(b)'s derivative-work provision does not allow the Court to conclude that PYOG is a "derivative work" of, and thereby infringes on, BMBH merely because it contains a one-second

---

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

*Bridgeport*, 410 F.3d at 799-800 (citing 17 U.S.C. §§ 106, 114(a)).

[9] Moving to Section 114(b), the *Bridgeport* court focused on two specific provisions, one dealing with derivative works and the other with similar-sounding works:

Section 114(b) provides that "[t]he exclusive right of the owner of copyright in a sound recording under clause (2) of section 106 is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality." Further, the rights of sound recording copyright holders under clauses (1) and (2) of section 106 "do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording." 17 U.S.C. § 114(b) (emphasis added). The significance of this provision is amplified by the fact that the Copyright Act of 1976 added the word "entirely" to this language. *Compare* Sound Recording Act of 1971, Pub.L. 92-140, 85 Stat. 391 (Oct. 15, 1971) (adding subsection (f) to former 17 U.S.C. § 1) ("does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds"). In other words, a sound recording owner has the exclusive right to "sample" his own recording. We find much to recommend this interpretation.

*Id.* at 800-01.

snippet of BMBH.

Second, the *Bridgeport* court's reading of Section 114(b)'s similar-sounding work provision is more expansive than its text and legislative history suggest. The similar-sounding work provision reads:

> The exclusive rights of the owner of copyright in a sound recording under clauses (1) and (2) of section 106 do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording.

17 U.S.C. § 114(b).

The *Bridgeport* court appears to interpret this language to mean that protection in a copyrighted sound recording extends to *every* sound fixed in the work such that a sample of *any* sound automatically constitutes infringement. However, a more plausible reading of this provision is that protection in a copyrighted sound recording "do[es] not extend" to sound recordings which, although *similar-sounding*, do not capture *any* sounds from the copyrighted sound recording. On this reading, an appropriate implication is that PYOG infringes on BMBH if PYOG both: (1) samples any sound from BMBH; *and* (2) "imitate[s] or simulate[s]" BMBH.[10]

Thus, Section 114(b)'s similar-sounding work provision governs the relationship between similar-sounding sound recordings and whether they share captured sound. There is no indication, however, that this provision relates to works which are not similar-sounding or that Congress otherwise sought to abandon the substantial similarity inquiry.[11] Section 114(b)'s legislative history supports this view:

---

[10] For example, if Timothy Mosely performed a live rendition of BMBH using a background sample of the BMBH sound recording in which Saregama indeed held copyrights, then fixed his performance in a sound recording called PYOG, Mosely's sound recording would infringe on Saregama's sound recording copyright because his PYOG sound recording both: (1) does *not* "consist[] entirely of an independent fixation of other sounds"; *and* (2) it "imitate[s] or simulate[s] those [sounds] in the copyrighted sound recording." 17 U.S.C. § 114(b). By contrast, if Mosely performed a live rendition of BMBH *without* a background sample of Saregama's BMBH sound recording, then fixed his performance in a sound recording called PYOG, then, despite the fact that PYOG "imitate[s] or simulate[s]" BMBH, Mosley does not infringe on Saregama's purported copyright because he has not sampled *any* sound from the BMBH sound recording. *Id.* In neither case, however, does the similar-sounding work provision govern where Mosley samples a snippet of the BMBH sound recording in a work that is not substantially similar. Therefore, if Mosley samples a one-second snippet of BMBH in PYOG, the Court must still inquire into whether PYOG and BMBH are substantially similar before it can hold that Mosley infringed on any BMBH copyright.

[11] Professor Nimmer concurs:

> [The *Bridgeport* court's] conclusion rests on a logical fallacy. By validating entire sound-alike recordings, the quoted sentence contains no implication that partial sound duplications are to be

-21-

Subsection (b) of section 114 [] makes clear that statutory protection for sound recordings extends *only to the particular sounds of which the recording consists, and would not prevent a separate recording of another performance in which those sounds are imitated.* Thus, infringement takes place whenever *all or any substantial portion* of the actual sounds that go to make up a copyrighted sound recording are reproduced in phonorecords by repressing, transcribing, recapturing off the air, or any other method, or by reproducing them in the soundtrack or audio portion of a motion picture or other audiovisual work. *Mere imitation of a recorded performance would not constitute a copyright infringement even where one performer deliberately sets out to simulate another's performance as exactly as possible.*

17 U.S.C. § 114, H. Rep. No. 94-1476, p. 106 (emphasis added).

In sum, Section 114(b) does not seem to support the distinction between sound recordings and all other forms of copyrightable work that the *Bridgeport* court imposes. Apart from its reading of the statute, the *Bridgeport* court proffers a variety of policy-based arguments for treating sound recordings differently than other copyrightable work. *See Bridgeport*, 410 F.3d at 800-05. The *Bridgeport* court's policy prescriptions, however accurate they may be, do not present grounds for this Court to follow its direction. Therefore, the Court will grant Defendants' motion and deny Saregama's motion on this issue.

C. Saregama's Motion for Voluntary Dismissal

Saregama seeks dismissal of its music composition infringement claim against the WB-Universal Defendants on the condition that each party bear its own fees. However, Saregama has not demonstrated why the Court should preclude the WB-Universal Defendants from even attempting to prove an entitlement to fees on the musical composition claim. While the Court makes no decision on whether the WB-Defendants are entitled to fees on the musical composition claim, it will grant Saregama's motion for voluntary dismissal with prejudice without addressing any issue that would bear on the WB-Universal Defendants' opportunity or right to seek fees. If the WB-Universal Defendants believe it is a wise of their and the Court's limited resources to seek fees in this case, they can do so.

**V.     Conclusion**

As discussed above, the Court will grant Defendants' motion and deny Saregama's motion as to the

---

treated any differently from what is required by the traditional standards of copyright law--which, for decades prior to adoption of the 1976 Act and unceasingly in the decades since, has included the requirement of substantial similarity.

4-13 Nimmer on Copyright § 13.03.

ownership issue because the 1967 Agreement confers no more than a license to exploit Shakti's pre-recorded songs and there is no evidence from which a reasonable jury could conclude that the BMBH sound recording was created during the term of the Agreement or that copyrights in the BMBH sound recording were subsequently conveyed to Saregama.  Further, although the Court will deny Defendants' motion as to the originality issue, it will grant Defendants' motion as to the substantial similarity issue and deny Saregama's motion because no reasonably jury, properly instructed, could find that the two songs are similar.  Because the Court finds Defendants' motion dispositive on both elements of Saregama's *prima facie* infringement case, it need not consider the individual motions of Defendants G-Unit and Desperado Entertainment.  Accordingly, it is hereby

ORDERED that:

(1) Defendants' Motion for Summary Judgment [DE 176] is GRANTED.

(2) Saregama's Motion for Summary Judgment [DE 181] is DENIED.

(3) Saregama's Motion for Voluntary Dismissal [DE 148] is GRANTED IN PART.  The musical composition claim against the WB-Universal Defendants is DISMISSED WITH PREJUDICE.

(4) All pending motions not otherwise ruled upon are DENIED AS MOOT.

(5) This case is CLOSED.

DONE AND ORDERED in Miami, Florida this ___23rd___ day of December, 2009.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:     Magistrate Judge O'Sullivan
        Counsel of Record